LEE BROMBERG. Good morning, Your Honor. I'm Lee Bromberg for DATATERN, the appellant in this case, and this case involves primarily the 502 patent, so let me go right to that. We believe, as Mr. Belk said in his argument, that the district court, again, inserted limitations and requirements into clear and unambiguous terms that were not required by the claim language or the specification of the prosecution history. The first one up is object model, and DATATERN offered the definition of object model as a template with a predetermined standardized structure, pretty much taking that right out of the specification, and it may but need not include representations of attributes, names, types, and inheritance relationships of classes. However, what the district court said was it has to include object classes and inheritance relationships among classes, and there is simply no support in the intrinsic evidence of this case for that. The district court acknowledged that, quote, the language of the specification and claim one do use the words as recited by DATATERN, close quote, but nonetheless pronounced itself unable to determine whether an object model must necessarily include classes. The court then, in the face of unambiguous and clear claim language that did not require the inclusion of those things, went to the intrinsic evidence finding. Isn't the issue of object models, including behaviors, really a result of your agreeing to a definition of classes that incorporated behaviors? No, Your Honor, because that was a definition of class as it appeared in the claim in a different place as including behaviors, and object model, the idea of putting class into object model, was something that SAP encouraged the court to do and that the court did do, but there was no basis for that inclusion, and it created more confusion because the district court then had to explain, in its opinion, why even though she was requiring object classes and inheritance relationships among classes, those classes did not have to have behaviors because they clearly don't. Figure three, the object model that's shown in the specification, does not have behaviors, as Mr. Reines acknowledged on behalf of SAP in the argument before the district court, do not have to have behaviors, but the parties had agreed that classes would include behaviors, so it's just adding to the confusion for the district court to require that the object model include classes. In fact, the specification, Your Honors, says the object model can be created from database schema. There are no object classes in database schema, and that's at column one, lines 56 to 57. So it's a very broad-term object model. It's designed to provide an abstraction that will facilitate the objective of this invention, which is to permit an object-oriented application, not a particular one, but any one, to access data from a relational database when it needed it. And so an interface is the invention. So even figure one shows that the object model is very different from the object-oriented application there. Hold on to the create an interface object. Didn't she disavow the claim construction here? Your Honor, I— The prosecution history avow that the court found actually have substance. Okay, Your Honor, we think that there is no—on that create an interface object, there was no prosecution history disclaimer of the preferred embodiment in figure seven as the patent states. Here's the address for you. Column six, lines 31 to 32. Figure seven illustrates the sequence of actions that take place when a business object—that's something that's in an object model—creates a DSL object, a data services layer object. That's the interface object. So when that happens, you have the result that you're looking for, and that's directly contrary to the recorded prosecution history disclaimer. The problem with the prosecution history disclaimer argument is the patentee made a statement to distinguish over parallel. Parallel was not prior art. The examiner did not require any claim amendment as a result of the distinguishing over the parallel prior art. And in context, the statement was really about the parallel user objects being different from the interface objects of the invention. And the interface objects of the invention are actually created by the runtime engine. They're instantiated by the runtime engine in accordance with the method of claim one of the speculative patent, and not by the object-oriented application as the court required in finding an instance of prosecution history disclaimer. So we think it is simply not supported in the record. It is not a clear disavowal of claim scope under any stretch of the imagination. And in context, it was clearly just a statement about the patent that may perhaps have been inaccurate, similar to the storage tech versus Cisco case that this court cited in 2003, where the statement may have been an inaccurate description of how a claim term is read just plainly on its face. Then it's not going to amount to a disclaimer unless there is something in the claim language that gives you a hook to include it. And there is none in this claim language. The claim language is simply to create an interface object. And that term create is used throughout the specification in the same sense of to make. In its ordinary sense, it does not require the generating code for a class, which is what the district court said was called for by that term. There's simply no requirement for that. We pointed out in our brief a claim differentiation argument for claim 10. But even in claim 10, it's talking about code generation for an interface object. But it does not include the additional step, which the district court stuck in there, of code generation of a class. So the key issue on that point, Your Honors, is code generation of a new class from which an interface object is instantiated required by this claim, or can you have instantiation from a pre-existing class? And we submit the record is clear. The only person of skill in the art who commented on this on the record was Mr. Gupta, our expert, and he said it can be instantiated from a pre-existing class. So again, you have this kind of time issue. If you have a class already, can you instantiate an interface object from it? And in our invention, you clearly can because you are using the runtime engine to instantiate the interface object from pre-existing classes. So let me go on to the third term, if I may, Your Honors, and that is the term runtime engine. And the one and only product of SAP that was ever at issue in this case was business objects. There were users in Texas who were sued because they used business objects and incorporated it into their own IT methods and procedures, and that was the basis on which those cases went forward. And again, we believe there was, at the time that the suit was filed, there was no jurisdiction. We filed a conditional counterclaim when our motion to dismiss was thrown out. We turned it into a counterclaim of infringement in the New York actions that was to protect our rights. And is it true there was no communication between SAP and Data Turn at any point prior to filing it with CJ? That's correct, Your Honors. That's correct. In this case, as long as we're talking about this CJ jurisdiction issue, a related aspect of this is the district court entered summary judgment of non-infringement against Data Turn with respect to the 402 path when we did not bring forward infringement contentions because we did not believe we had a basis for bringing forward infringement contentions. And at that point, we believed that whatever DJ jurisdiction existed disappeared, so the court should not have entered summary judgment. But to make matters worse, the district court said summary judgment as to all SAP products. And Your Honors, the only product of SAP that was ever at issue in the New York action was business objects. So we think that was an overreaching summary judgment that should not have been granted. If I may turn for just a couple of minutes to the Runtime Engine term. This is another term where the district court added a bunch of requirements. Properly speaking, the Runtime Engine is software. It's not directly part of the object-oriented application, but it's used by the object-oriented application to access the relational database. And that's the whole idea of this invention. You have an object-oriented application that can't talk readily to a relational database. This is going to provide an interface, a particular method to provide an interface so that you can get the data that you need. The district court said that the Runtime Engine has to be understood to mean software that the object-oriented software application depends upon to run, must be running to execute it, uses the math in its processing, and is not part of the object-oriented application. None of these requirements are supported by the claim language or the specification for the prosecution history. And in fact, what SAP did here was make another prosecution history disclaimer argument without really identifying it as such. But these four additional requirements are inconsistent in themselves. It's kind of like doing the splits. How can the object-oriented application need the Runtime Engine to actually execute, but yet not have it be part of the object-oriented application? It simply makes no sense. So what SAP argued, in effect, and the district court accepted, was that Runtime Engine should be understood to mean a runtime environment, something that makes the whole thing work. But of course, the object-oriented application can execute, can run, can do everything to its heart's desire without the Runtime Engine of this invention. It's only when it's going to access data from a relational database that you would bring in the methodology here and want to use the Runtime Engine here. Now, let me talk for a minute about the purported prosecution history disclaimer. Dave Turn put in a declaration from Mr. Eisner, a software expert, who explained the difference between Runtime Engine, which is a specific block of functionality that is used in this method to permit the object-oriented application to access data from a relational database, and a runtime environment, which is an environment that permits the whole object-oriented application to run. And this declaration was put in to distinguish over the Chang reference. The examiner accepted the distinction, allowed the claims, did not require any amendment, and so the claims issued as we see them today. And in accepting them, he stuck in a definition from PC Magazine, or a set of definitions. It was actually partial. The way it appeared in the prosecution history was cut off. He stuck that in there, and his purpose was, as he specifically said, this is the examiner, this supports Mr. Eisner's statement that there is a distinction between a Runtime Engine and a Runtime Environment. So that was the extent of it. He never relied upon it, he never said he was relying upon it, other than to support the distinction. And of course, the patentee never said anything about the PC Magazine definition, never said they were endorsing it, rejecting it, anything. So there couldn't possibly be prosecution history disclaimers. And the district court, in its confusion, accepted from the SAP's expert a much later version of that same PC Magazine set of definitions, we don't know if it's the same or not, and called it, quote, intrinsic evidence. Something that an outside expert found on the internet and put into the court record, it was not in the prosecution history, so that's plain error. If you can do that to influence how a claim term is to be defined, then we're just throwing out all the rules of claim construction that this court has very carefully delineated over the last 20 years. So we think that that one should also be rejected, and I thank you for your attention. Thank you. Mr. Bromberg, you've consumed your rebuttal time, as you recognize. We did restore it to Mr. Belt. The distinction is we took a lot of Mr. Belt's time and very little of yours. You put me in a hard place as to whether I should restore your rebuttal time. I'm going to do it, but next time you watch the light. Thank you. All right, let's see if I can do a better job of satisfying on the comparisons between ARIS and this case. Let me make it more difficult for you, actually. I'm looking at ARIS, and an important part of that was that BT repeatedly communicated its implicit accusation of contributory infringement directly to ARIS during the course of a protracted negotiation process. So there was things going on between ARIS and BT, which don't seem to be happening well at all with SAP and only to a limited degree with Microsoft. How do we get around that? Well, that distinction's fair. I think you just go right back to ARIS and ARIS's reliance on Arrowhead that direct communication between a patentee and a declaratory plaintiff is not necessary for jurisdiction. I think it's additive. I think it's part of all the circumstances, which is the MedImmune guidance. But so are favorable things here, like the indemnity requests, like the scale of the litigation. To me, the scale of the anonymous claim charts, the fact that the claim charts aren't tailored in any way to the customer. Mr. Reines, are you really just looking for a way to get out of ED Techs? No, I think it's more to group. The most important thing is to group the litigation in one place, where you can decide. But it all was in one place, wasn't it? ED Techs. Well, in other words, go file the D.J. action there. I don't see why that would be going to the subject matter jurisdiction of whether you can file a declaratory. I think when people have intervened, they've had mixed results. When people file declaratory judgments, as we can see from this display today, they get mixed results. I think people are gun-shy about doing it. I think that this is probably, to my mind— But you claim that so much of what you did in this case was for efficiency purposes. You've got judges in the Eastern District of Texas that are clearly well-educated on the facts of this case. So how is it in order of efficiency, which you claim to be a champion of in your behavior in this case, to have filed in a totally different form? I mean, so there's a few considerations there. One is, the judges there—I mean, I don't think they've yet reached claim construction. So they weren't ahead. It was sort of pretty quick, and those cases didn't— They weren't ahead, but those cases were stuck in ED Tech. No, in terms of—you said that there were judges that had learned the case and so on and so forth, and I was just saying I didn't believe that to be the fact. In terms of— You don't think those judges do anything on those cases until claim construction? Is that your suggestion? I mean, it's not that there's no strategic or tactical considerations. I wasn't involved, so I can't answer, but I could imagine someone thinking, if I go to the Eastern District of Texas with their traditions and styles, they're going to move the customer cases first and put this on the back burner. And what these companies wanted is what I think is the only rational thing—we may disagree about that—but that is to have this dispute about whether this software infringes or not, deciding between the real party and interest. Wait, wait. Time out, time out, time out. I don't understand. Are you saying that the Eastern District of Texas, when they sued the customer for direct infringement, that court would not have decided whether the use of ADDO.net amounted to direct infringement? Right, because they receive a demand for $300,000. Look at the time and energy that the Chambers has to put to understand this. Anyone listening to this argument knows how difficult this technology is. Are you going to really figure it out and fight to the end and then come up to here to a skeptical bench, or you can just get out—the starting price is $300,000. You can get out for $100,000 or $150,000. I don't think any of those cases are going to be tried. Well, okay. So you made a good case. You painted them as a nuisance-value-seeking troll quite clearly in your brief. In five different places, you alleged as much with the claim— No, we just put the settlements in front of you. No, you actually said they're seeking nuisance value. Those were your words. That's what the numbers are, yeah. If you don't think that's an implication, that they are a troll doing something improper, it's hard for me to— It doesn't matter. Really? I don't feel like nuisance—when you say someone's suing for nuisance value, you're suggesting they have absolutely no legitimacy to their claim and they're just seeking some minimal amount and that they're extracting— That is true. Okay. The latter part is true. Who they are, I don't really care about. It's out of personal. So if their pattern, their consistent pattern, is going after smaller or sort of companies with less on the line so that they can extract these settlements, while I realize the reasonable apprehension suit, or as I put it, quaking in your boots standard, no longer applies, why would Microsoft think it has legally adverse interests? You clearly are a litigate to the death sort of company, so why would you be worried that DataTerm was coming after you when you did such a brilliant job of establishing in your own brief the model for their litigation behavior, which is completely inconsistent with the Microsoft model? I mean, that's the point that I'm not effectively communicating. The question is, is it joined up enough that the parties can have a fair and square litigation where the judiciary isn't being put in the situation of a hypothetical dispute that's not real, and if they could have brought an indirect infringement claim per ARIS for a microchip, that's sufficient. You're looking for the threat. You're looking for the threat of litigation. As Judge Rader pointed out, though, there was an implicit indirect infringement claim in ARIS, and as Judge Dyke explained in his opinion, he went through all the facts of every element and showed how there was some degree of plausibility, such that it demonstrated there really were legal adverse interests. My concern is I feel like all Microsoft, or in this case SAP, has is their product when used by a customer is accused of direct infringement, and I feel like that's such a far cry from what's necessary to be proven for inducement or contributory that I feel like just because your customer is accused of direct infringement doesn't mean they have a case against you for indirect or contributory, and my problem is I don't see anything else in this record to support all the other elements. And that's why I'm struggling with the DJ jurisdiction. I agree with you. If it was just the limited thing you said, there wouldn't be an issue, but there doesn't need to be a threat, and that was really the gist of it. No, I agree. Let me just get to the one thing I really want to get to, which is talk about ARIS and the fact of this case and how it's actually… But can you answer my question? How does this record describe anything other than them accusing customers who use auto.net of committing direct infringement? Just let me have 60 seconds and I'll get to it, okay? In ARIS, when they say there's an implied indirect infringement, they start with the paragraph that says, at a minimum, and it says, BT, identify ARIS, and then there's the product type, as satisfying at least one substantial element or method except every asserted claim in its infringement contentions. It implies that ARIS's products are being used as, quote, a material part of the alleged invention, one of the required elements to contribute to infringement. And you've got that here in spades. These claim construction charts, check. Right. You're on point. Keep going. So this is more where BT alleges that ARIS CMTS, you know, out with that too, were designed specifically for use, standards suggested that they were specially made or adapted, okay? That's all there is. So the suggestion that there's… No, go further, and are not staple articles of commerce suitable for any non-infringing uses. Quoting the… Yeah, but ADO, but there's none of that here. There aren't facts in this case that support the idea that ADO… Okay, I think I have a little of that time left. Do you think your 60 seconds has an… I hope not. I just want to get to the point that I want to make. At A3511, for example, on object model… A3511 of SAP1 or Microsoft? SAP. I'm hoping you find it. Okay, I think we're all with you. Okay, great. It says, in order to utilize business objects, which is SAP product, of course, a user uses the business object design application to specify a business object universe. A key first step in creating a universe is to select a set of business concepts related to the data in the relational database and to create a set of objects that encompass these concepts. This set of business concept object is an object model. So it's telling you in order… One looks at this, it's telling you that in order to use this product, you must create an object model. That they're saying is infringing because it's in an infringement contention. And every single chart is the same because they didn't even take the care to make them custom, which I think is another very important fact. So they hand it out to anybody without doing any investigation as to whether they did any customization or any tailoring to use something other than for its intended purpose. Maybe a skeptical mind looks at this and says that that's not an implied statement that it's specially adapted or that… Just to be clear, technically what you just read is designated confidential in my appendix. And so I'd like to be able to address it. Is there a reason that I cannot? It's now out of the bag anyway. So if there's anything confidential about it, it's out of the bag. So to me that should be above any bar and is not materially different from what was in ours. I just don't see a bright line. Perhaps the problem is I don't even understand what you're suggesting this implies. Can you tell me, make it clearer to me? I don't get it. An object model is a required element of the claim. No, I understood that part. I was with you there for that part, Mr. Reines. But how does this establish that there is a legally adverse interest vis-à-vis in direct infringement, contributory or induced infringement? As opposed to just use of this as one of the elements for direct. So the way I read that is it's saying that the only way to use this system is to use the object model, which implies to me an especially adapted component. In that way, it's no different from ours. There's no capability to distinguish it. But what I understood your actual gist was, and that's just the first paragraph. I was here on the fly. It's all over these claim charts. I think you'll find more of that throughout. Every single requirement of the claim is met by the business object's product, every single claim element. Now, really the gist on the prior argument you were making was about Center. That's the way I took it. No, you're exactly right. That's why I said check the box on the first element of Eris, which is the accused applications, Addo and business objects, are both argued to be essential for purposes of direct infringement. I don't know that they're really even arguing that's not true. It's not just that, and I'm not – they're saying that to use business objects, you have to use the object model that meets the claim requirement. That's the way the system works. It doesn't imply that there's any other way it works or does anything else. That would be especially adapted. If it doesn't work any other way, that's the only other way it works. That's what it's for. It's for infringement. It's for the object model. Now, what I actually – so that really, to me, in terms of whether – I guess part of the problem is nothing like what you just said is in the record, and I don't know if that's true from a technological standpoint. I know for a fact Addo.net has lots of non-infringing potential uses. It doesn't just retrieve data in an object oriented to a real configuration. So I know that it can have non-infringing uses. I'll be honest with you. I don't understand much about the FCC. I think this paragraph – if one doesn't accept this is specially adapted, then they're not – then I'm not going to be able to do anything today to accomplish that. In terms of CENTER, which I took as most of the challenges that I was getting in the first, there's nothing – I think there's a CENTER requirement for 271C. I think it's substantial. I think it requires culpable intent. I don't think that's debatable. If you look back to Grokster, Grokster is clear, which is the roots for Global Tech. That pair of cases is very clear that it's not unique to 271B. It's common to 271C. They both came out of the same doctrine, as the court knows from ARO. There is clearly a CENTER requirement that requires culpability in both. Now you may want to debate – I know we're having the current debate on the en banc vote that was recently had about what the exact standards are at Comel, but the point being there's a culpable intent under B and C, and in ARIS, there's no suggestion that there is culpable intent. And in fact, when BP made the very same argument as the kind that you are, which is to say, where's your proof that you had intent? That's one of the requirements too, right? This attempts to prevent manufacturers from coming in to protect their products in these scenarios. And the answer was, that's silly. You don't have to admit guilt in order to get into the courthouse. So you wouldn't want to say, well, yes, we have culpable intent, or yes, it would be obvious that we have culpable intent. Why would we force a legal effort to take that position? That wouldn't make any sense. And there's no showing anywhere in ARIS at all. Because you said that Judge Dike went through each element of any CENTER showing. I haven't been able to find it. I went back through. I think I know the case pretty well as it is. But what I do see is him saying that it's a surprising argument that someone would suggest. You have to actually say that you're causing the infringement in order to be asked to court. Now, I would also say that on the indemnity, I think that it's very important for this court to make clear that an indemnity threat is enough to warrant a manufacturer's D.J. Because expecting a company such as Microsoft with flexible products or SAP. That's crazy. Then you just manufacture an indemnity request in every case from one of your customers, or one of your customers goes out on a crazy lark and demands you indemnify them, even when there's no ground for it. And you're saying that gives you an open door to walk into any court you want and file a D.J. Look, you may think they're a troll, but you're going to drag patentees, good, bad, whatever, into court on just some action by a third-party customer of a supplier. They're requesting indemnification. That's enough? No, I think you need to have a bonafide claim. So I'm not talking about speculative things or things with no basis. The discovery process can surely ferret that out. Your scenarios don't concern me at all. What concerns me is the cases that get filed weekly and monthly that are destroying the reputation of the patent system, where people file suit against 60 different companies. So it started at $300,000. When we got to after we won on claim construction, it was down to $50,000 Mr. Rhinus, if you prevailed on your arguments, would this dispose of all the customer suits? I'm always reluctant, having been around long enough, about the first court saying exactly what the preclusion effect would be in the second court. So I think it should. I don't know every patent pattern. They suggested that the reason they couldn't sue Microsoft or SAP is because these are infringed in so many different ways that Microsoft and SAP would not be an efficient way to find out if there was infringement. Are they correct? They're absolutely not correct. You have the record of what the infringement allegations are and all that. And I think beyond that, the thing that's most compelling to me on that is the contentions, which don't even attempt to do any customization on a per-customer basis. So with all of that, yeah, I think this will resolve it. I think the court is willing. If the court affirms, then the claim constructions will take care of all the many cases against the many people that buy databases for their corporate. Now, I'm a big fan of efficiency. I think that's a laudatory goal. But why should we force them to litigate against the supplier when that requires them to establish elements of intent and knowledge and essentiality and non-staple article and all of these other things that are clearly a much more challenging burden of proof for them than simply going after the customers who are direct infringers? I mean, that's an easier case to make out, surely, from a proof standpoint. Well, I mean, if we're thinking systemically from an efficiency perspective, you know, you don't always get into arguments where you speak that way. But if that's the way we're looking at it, I think incentivizing claim drafters to draft claims that would cover the actual source of the technology such that there's a direct infringement claim against companies rather than encouraging them to draft it for the customers where they can engage in the mass customer litigation and benefit from the cost of litigation defense against each of the many different customers is a very healthy incentive for the system. So the first thing is I think that's a healthy incentive. The second thing is if the end result of the case is that the claim failed not because it's here, and Chief Judge Rader, not surprisingly as smart as he is, put his hand on it, because you're getting to the merits. I think we got to the merits here. It wasn't really a customization for customer site. No one ever asserted it was. It wasn't just the enter issue. That's not what this case is coming from. You can resolve everything. If it got resolved, and I should have been careful. Judge Rader was asking me about this record. But if it was decided on the grounds that there wasn't culpable intent, for example, under Connell, then I think that you might not have preclusions. And I think if they had to litigate and lose on that, and then they could go and go one by one against 1,000 customers or 10,000 or whatever letters, writing things, then that's the way it would go. But I think incentivizing the claim drafting the right way, it's not healthy what's happening, and it's destroying public trust. It's not healthy? I don't know. I don't think making a small patentee go up against a sort of huge company and where they have a much harder burden of establishing inducement or contributory is something that's necessarily a good thing for us to do. I think that that creates a much more difficult challenge for them from a legal standpoint. I understand there's some concerns it's a public company, so I wouldn't worry too much about that in this case. But there may be sympathetic cases that you're pointing out. I think the mass customer litigation is the most pernicious thing, in my personal view, the most pernicious thing in the system right now, and it's destroying public trust. But you could fix it, indemnify one of them. They're only on the hook for $300,000. That's a lot more than they paid you to prepare for this. And then you just walk into court and you take over, and that's how you do it. You have the power to fix this for virtually no money at all. Get your day in court, as Michael said. I don't think it's for no money at all. I don't think it's realistic to expect somebody to indemnify what the damages claim might be about how each individual company is using the database based on the kind of damage. Not only that, you only have to pick one. You're saying this is a case about direct infringement. You just have to pick one of those companies. I think the ability to work within the system and go into one customer case and sort of get that to stop all the other customer cases wouldn't happen, especially with your guidance to go to Eastern District of Texas for this. All right, thank you. Thank you very much. Let's hear from Mr. Bromberg. Two minutes. Thank you, Your Honor. Very briefly, a lot of negative terms have been thrown around by Mr. Reines in policy discussions, and I think they're not relevant. I may have been responsible for most of those, and I apologize. That's all right, Your Honor. You can do that. No, I can't. And I wasn't meaning to characterize either side. I think you've both done a fabulous job in this case, and I appreciate the excellent counsel that I've gotten, and it helps me understand the case better. Well, thank you, Your Honor. I do think that there is an important point here that Data Turn, first of all, started out like its predecessor company with these two great inventions. One of them, the 502 SAP, said, this is one of the ten most important patents in the world. They said that in 2001. They tried to get rights under it. That didn't work. Data Turn put out a product. It got swamped by much bigger competition. So it didn't start out life as a non-practicing entity even, let alone the derogatory terminology of it. Why didn't you at any point approach SAP and Microsoft since your claim charts list them in every instance? Well, Your Honor, it's because the technology here, the software, is extremely complicated, and that you can grab a hold of certain pieces of it. What Mr. Reiner showed you from the confidential section of the appendix related to one element of claim one of the 502 patent, object model. Every claim chart mentions SAP or Microsoft software. Why don't you even talk to them? Well, Your Honor, I think... Are you avoiding them? Why are you avoiding them? This is a situation where the devil is... Why do you bring all the cases in the eastern district of Texas rather than spreading them to more convenient locales? Because of the speedy procedures down there and the detailed procedures. And in this type of case, the devil is... Just a second. You filed them where? Sorry? We filed them where? A predecessor counsel filed them in the eastern district of Texas. Yeah, but where? We all know that you can file specifically in a location in the eastern district of Texas and the case stays there. Where did you file them? Marshall? Tyler? I think Marshall. Marshall. Interesting. Marshall has... The judge there has, at last count, 682 cases on his docket. Patent cases. The judge in Sherman? I think around a dozen. Why didn't you go to Sherman? I wasn't involved in that decision, Your Honor. But I think we all know what's going on here. We're talking about forum shopping, but isn't there some specific forum shopping going on at the filing stage? Well, I wouldn't agree with that, Your Honor, and I believe that what you have to do in one of these cases is you have to make a detailed proof of contentions and then proof of infringement based not only on the underlying product, business objects or ADO.net, but also on the way that particular company, and as Mr. Belt said, these are large companies. They have their own IT departments. They're implementing these products supplied by SAP and Microsoft in their own way, and that's what you have to do to show infringement. And certainly at the time that these two large entities then sued DataTurn in New York, claiming that they had a right to do so, we did not have... Have any of these ED Tech cases gone to the merits? No, Your Honor. How many have been settled? Many dozens. Many. That isn't at all a part of your strategy, is it? I can't speak for other counsel, Your Honor. Thank you, Mr. Bromberg. Thank you.